# Richmond

## George W. Milam, Et Al. v. Commonwealth of Virginia.

June 16, 1958.

Record No. 4783.

Present, All the Justices.

The opinion states the case.

*Edward L. Breeden, Jr., (Robert R. MacMillan; Breeden, Howard & MacMillan; Kellam & Kellam; Jones, Blechman, Woltz & Kelly,* on brief), for the plaintiffs in error.

*John W. Knowles, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

This appeal involves the validity of a judgment of the lower court entered pursuant to Code, § 4-55, as amended, forfeiting to the Commonwealth of Virginia 1,210 gallons of alcoholic beverages, whiskies and gin, found in the possession of two warehouses in the city of Norfolk, on the ground that the beverages were acquired, possessed and stored in this State contrary to the provisions of the Alcoholic Beverage Control Act, as amended. (Acts 1934, ch. 94, p. 100, as amended; Code of 1950, § 4-1, *etc.,* as amended.)

The proceeding was commenced by the seizure of the liquor under two search warrants and its delivery to the police court. George W. Milam and others filed petitions claiming certain portions of the liquor and protesting its seizure. Pursuant to Code, § 4-55, as amended, the police justice certified the warrants, the seized liquor and claims thereto to the Corporation Court of the city of Norfolk where the matter was heard without a jury and resulted in the entry of the judgment of forfeiture. Milam and other claimants of the seized liquor have appealed.

The substance of the contentions presented in the assignments of error is that the liquor was not imported into, or acquired, possessed, or stored in this State contrary to the provisions of the Alcoholic Beverage Control Act, as properly interpreted, and hence was not subject to seizure and forfeiture.

The principal facts are not in dispute. On March 29, 1957, investigators of the Alcoholic Beverage Control Board and members of the police force of the city of Norfolk, armed with search warrants, seized 982 gallons of distilled liquor in the possession of Merchants Waterfront Warehouse Corporation at 701 Front street, in the city of Norfolk, and 228 gallons of similar liquor in the possession of the Jones Warehouse Corporation at Jackson and Water streets in the same city. The liquor in both warehouses was stored under lock and key, but outside the enclosures for the storage of Customs bonded articles. All of the liquor was in one-fifth gallon bottles packed in pasteboard cartons. The cartons carried markings designating the names and brands of the various liquors therein contained.

It is undisputed that the alcoholic beverages were whiskey and gin manufactured outside of the United States and imported into this State. It is likewise undisputed that the liquor had been imported, in the manner hereafter to be detailed, for the use and benefit of officers and enlisted men of the United States Navy or Marine Corps, who, under naval regulations, are not permitted to bring liquor into this country on naval vessels. However, none of the cartons or bottles contained any markings which indicated that they were the properties of any individuals.

The record shows that orders for this liquor had been taken in two ways, denominated by the appellants as "Method A" and "Method B". Under "Method A," when a naval vessel was in a foreign port representatives of foreign brokerage firms dealing in alcoholic beverages were permitted to come aboard and take orders of the officers and members of the crew for the purchase by each of one gallon of specified brands of whiskey and gin at specified prices. The prices included the cost of transporting the liquor to Norfolk. With the payment of the required price the representative of the brokerage firm gave each serviceman a receipt showing the amount paid for "five-fifths" of the designated brand of liquor. On the back of the receipt was a stamp indicating the name and address of the Norfolk warehouse at which the purchaser was directed to "pick up" the designated quantity of liquor.

When the vessel arrived at Norfolk each purchaser filled out a Customs declaration and affidavit showing the value or purchase price of the liquor he had ordered. On approval of these documents by the Customs officials the serviceman was permitted under the laws of the United States to import, free of duty, the one gallon of liquor so declared. After the documents had been cleared by the Customs officials the serviceman proceeded to the warehouse named on his receipt and upon identification received one gallon of the brand of liquor therein specified.

Under "Method B," before a naval vessel left the port of Norfolk for a foreign voyage a representative of a foreign broker dealing in alcoholic beverages was permitted to come aboard and leave with the ship's supply officer a price list of and order blanks for alcoholic beverages available for purchase by servicemen while abroad. While the ship was on the high seas, or at a foreign port of call, the supply officer received from each officer and member of the crew who desired to purchase liquor his order for one gallon of the desired brand and collected from him the stated purchase price. The supply officer then dispatched by mail to the foreign brokerage firm the list of the names of those who had made purchases and the total amount of the purchase price so collected by him.

Upon the return of the naval vessel to Norfolk and the filing of the necessary declarations with the Customs authorities, the serviceman was permitted under the laws of the United States to import, free of duty, the gallon of liquor which he had so declared. Pursuant to directions, the serviceman contacted the representative of the brokerage firm at Norfolk who directed him to the warehouse where he might obtain the liquor which he had contracted to purchase.

A representative of the Collector of Customs at Norfolk testified that under the laws of the United States the liquor which these servicemen had contracted to purchase in the manner stated was "treated as having been acquired while abroad and * * * may be passed free of duty" under the federal tariff laws.

In the meantime the orders which had been taken for this liquor, in the methods stated, were forwarded by the brokerage firms to distilleries in Canada. These distilleries bottled out of their general stocks a sufficient quantity of liquor to fill the total of the orders of the servicemen and dispatched this liquor to Norfolk by motor vehicle carriers under Customs bonds. Upon their arrival at Norfolk

the shipments were cleared by the Customs authorities and released to the warehouses.

In some instances the liquor was consigned to one of the Norfolk warehouses or to shipping agents in care of the warehouse. In others the shipments were consigned to the supply officers of various naval vessels in care of one of the Norfolk warehouses. Representatives of the distilleries testified that according to their records this liquor was sold to the various brokerage firms who had taken, or authorized the taking of, the orders therefor. None was sold to any individual serviceman.

Upon the delivery of the liquor to the warehouses, no carton or quantity of liquor was set aside as the property of any individual or group of individuals. The warehouses had a list of the names of the individuals who had ordered and declared the one-gallon purchases of the specified brands. When such individual presented a receipt, upon identification he was presented with a carton of liquor containing one gallon of the brand shown on his receipt. The warehouse exacted no charge of the serviceman. Occasionally, when bottles or cartons were broken they were replaced from the general stock or "broken lot" of liquor held by the warehouse for the account of the brokerage firms. Any shortages were made "good" by the brokerage firms.

The first contention of the appellants is that this liquor was imported in strict accordance with the laws of the United States, was lawfully in this State, and therefore not subject to seizure under the Virginia statute. We do not agree with this contention. Assuming, but not deciding, that the liquor had been imported into Virginia in accordance with the federal statute, it does not follow that it was exempt from seizure and forfeiture under the laws of this State.

Section 2 of the Twenty-first Amendment to the Federal Constitution provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Congress implemented this amendment by the re-enactment of the Webb-Kenyon Act of August 27, 1935, which among other things, prohibits the shipment or transportation of intoxicating liquor "from any foreign country into any State" which is intended "by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation

of any law of such state." (49 Stat. at L. 877, ch. 740, § 202(b), 27 U.S.C.A., § 122.)

It is well settled that the effect of the Twenty-first Amendment and this statute is to remove the barrier of the Commerce Clause of the Federal Constitution so as to authorize a State to prohibit or regulate the importation of liquor into the State. *State Board of Equalization* v. *Young's Market Co.*, 299 U. S. 59, 57 S. Ct. 77, 81 L. ed. 38; *Indianapolis Brewing Co.* v. *Liquor Comm.*, 305 U. S. 391, 59 S. Ct. 254, 83 L. ed. 243; *Joseph S. Finch & Co* v. *McKittrick*, 305 U. S. 395, 59 S. Ct. 256, 83 L. ed. 246; 30 Am. Jur., Intoxicating Liquors, § 48, pp. 561, 562.

The next contention of the appellants is that the lower court erred in holding that this liquor was imported into the State and there possessed and held contrary to its laws. This contention is equally without merit.

Code, § 4-84, provides in part:

"(a) No alcoholic beverages other than wines or beer shall be imported, shipped, transported or brought into this State unless the same be consigned to the Board. * * *

"(d) The provisions of this chapter shall not prevent or prohibit any person from bringing, in his possession or in his baggage, into this State not for resale, alcoholic beverages in an amount not to exceed one gallon; * * *."

It is undisputed that the liquor here in question was not consigned to the Board as required by paragraph "(a)." Whether it was brought into the State within the saving provision of paragraph "(d)" will be discussed later.

Code, § 4-85, provides:

"(a) Alcoholic beverages may be imported into Virginia under United States customs bonds, and be held in Virginia in United States customs bonded warehouses; and alcoholic beverages may be removed from any such warehouse, wherever situated, to such a warehouse located in Virginia and be held in Virginia.

"(b) Such alcoholic beverages so imported or removed to such warehouses in Virginia, shall be released from customs bonds in Virginia, only on permits issued by the Board for delivery to the Board, or to other persons entitled to receive the same in Virginia, or to ships actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or trade between the United States and any of its possessions outside of the several states

and the District of Columbia, or for shipment outside of the State. * * *"

It will be observed that paragraph "(b)" provides that where alcoholic beverages enter this State in customs bonds, that is, in the custody and control of the Federal Government, they may be released from such bonds only on permits issued by the Board "for delivery to the Board, or to other persons entitled to receive the same in Virginia."

The record shows without contradiction that the liquor here in question was released to the warehouses without the required permits.

Code, § 4-75, as amended by Acts 1954, ch. 484, p. 579, provides: "It shall be unlawful to possess alcoholic beverages in amounts in excess of one gallon, in containers not bearing stamps or other evidence showing the same to have been purchased from the Board or a person licensed to sell the same under the provisions of this chapter or other evidence that the tax due to the Commonwealth or the markup required by the Board has been paid, unless it can be proved that the alcoholic beverages were lawfully acquired by the possessor thereof and lawfully transported into Virginia."

It is undisputed that the liquor here in question, in the possession of the two warehouses, was in containers not bearing stamps or other evidence showing that it had been purchased from the Board or a person licensed to sell the same under the provisions of the Alcoholic Beverage Control Act.

■ The appellants argue that notwithstanding the failure to comply with the above provisions of the law, this liquor was exempt from seizure because it was imported and brought into this State in strict accord with § 4-84(d), *supra*. It will be recalled that that paragraph says that the provisions of the Act "shall not prevent or prohibit any person from bringing, in his possession or in his baggage, into this State not for resale, alcoholic beverages in an amount not to exceed one gallon." Here the argument is that each of these servicemen, while abroad, purchased and acquired a gallon of this liquor which was placed in the hands of the brokerage firm as his bailee, that such liquor was transported into Virginia while in his *constructive* possession or as a part of his *unaccompanied* baggage.

There are ready and obvious answers to this contention. In the first place, there is no showing that each of these servicemen, while abroad, purchased or acquired the permitted gallon of liquor. He merely gave to the broker an order for and the purchase price of a

gallon of liquor of the desired brand. The sale was consummated when the serviceman presented himself to the warehouse at Norfolk. There the order of the serviceman was filled by the delivery to him of the desired quantity of liquor taken from the stock in the hands of the warehouseman. Prior to that time the purchaser had never seen or come into possession of the liquor, nor had any specified carton or bottles been set aside or marked for delivery or consigned to him. According to the evidence accepted by the lower court, his order was filled from a quantity of liquor which had been sold by the distilleries to the brokers and sent to Norfolk.

But even if it be assumed that each serviceman actually purchased a gallon of liquor while abroad, there is no showing that the manner in which it was imported into this State constituted a "bringing, in his possession or in his baggage," of such liquor as is permitted by Code, § 4-84(d).

It will be observed that in order to be within the privilege of this section the traveler must bring the permitted quantity of alcoholic beverages "in his possession or in his baggage." The context does not support the suggested interpretation that "possession," as here used, includes constructive possession, that is, possession by the brokerage concern or its agent, the carrier. "Bring" is defined in Webster's New International Dictionary, 2d Ed., as "To cause to come with oneself, as by conveying, leading, or carrying, from one place to another, * * *." Hence, the wording "bringing, in his possession," denotes personal custody by the traveler himself.

Assuming, as has been said, that the serviceman acquired title to the liquor when he gave his order and paid the purchase price, it did not come into his personal possession until it was delivered to him at the warehouse in Norfolk. Thus, the traveling serviceman did not bring it "in his possession" into this State.

It is equally as clear that the liquor was not brought by the serviceman into this State "in his baggage." "Baggage" is defined in Webster's New International Dictionary, 2d Ed., as "The trunks, valises, etc., which one carries on a journey." Certainly, the liquor here in question was not brought into this State in the trunks or valises or luggage which the serviceman carried, nor had it ever been a part of his baggage.

The fact that the United States Customs officials may have treated such liquor for tax purposes as a part of the serviceman's unaccompanied baggage is no reason why the State liquor control laws should

be given a like interpretation. The purposes of the two statutes are quite dissimilar. The Federal Customs laws are designed to raise revenue. The provisions of the Virginia Alcoholic Beverage Control Act are designed to control the sale and distribution of alcoholic beverages within this State by channeling their importation into Virginia through the Alcoholic Beverage Control Board.

It is argued that this interpretation of § 4-84(d) imposes a hardship on a serviceman returning from abroad on a naval vessel to a port in Virginia, because under naval regulations he is not permitted to carry intoxicating liquor on board. Thus, it is said, unless liquor can be imported in the manner in which it was done here, he is denied the privilege accorded a civilian traveling on a commercial vessel of bringing into this State, duty free, a gallon of alcoholic beverages. The answer to this argument is that the so-called hardship results from the naval regulations and not from the provisions of the State law. Under the laws of this State a serviceman has exactly the same right as a civilian to bring "in his possession or in his baggage, into this State not for resale," the same quantity of alcoholic beverages.

Code, § 4-53, as amended by Acts of 1954, ch. 484, p. 577, provides that "all alcoholic beverages * * * which are kept, stored, possessed, or in any manner used in violation of the provisions of this chapter, * * * shall be deemed contraband and shall be forfeited to the Commonwealth."

Code, § 4-55, as amended by Acts 1954, ch. 484, p. 578, outlines the procedure for the confiscation of forfeited beverages, which was followed in the present case.

We agree with the lower court that the alcoholic beverages here in question were imported into this State, and were acquired, possessed and stored here, contrary to the provisions of our statute and were properly forfeited to the Commonwealth. Accordingly, the judgment of forfeiture appealed from is

*Affirmed.*